**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WESTMINSTER SECURITIES CORP., )<br><br>        *Petitioner*, )<br><br>        v. )<br><br>PETROCOM ENERGY LIMITED, and )<br>PETROCOM LIMITED, )<br><br>        *Respondents*. ) | No. Civ. 10-7893-DLC<br><br>ECF Case |

**MEMORANDUM OF LAW**
**IN SUPPORT OF RESPONDENTS' MOTION TO VACATE ARBITRATION AWARD**
**AND IN OPPOSITION TO PETITION TO CONFIRM**

Todd R. Geremia (TG-4454)
Laura W. Sawyer (LS-4385)
JONES DAY
222 East 41st Street
New York, New York 10017

*Attorneys for Respondents,*
*Petrocom Energy Limited and*
*Petrocom Limited*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 4

    A.    The Parties' Commercial Relationship .................................... 4

    B.    The Placement Agent Agreements............................................ 4

    C.    The AEI Transaction................................................................ 6

    D.    The Arbitration Proceedings .................................................... 7

    E.    The Tribunal's Award .............................................................. 8

ARGUMENT ..................................................................................................... 10

  I.    THE TRIBUNAL'S AWARD MANIFESTLY DISREGARDS THE
       CONTRACT AND CLEARLY APPLICABLE LAW........................................ 10

    A.    An Award That Is Predicated on the Arbitrators' Manifest
          Disregard of the Contract or the Applicable Law Should Be
          Vacated ..................................................................................... 10

    B.    The Panel Manifestly Disregarded the Tail Provision and New
          York Law .................................................................................. 11

  II.    THE TRIBUNAL EXCEEDED ITS AUTHORITY BY ADJUDICATING
       A NON-ARBITRABLE CLAIM BY WESTMINSTER FOR UNJUST
       ENRICHMENT ............................................................................... 16

    A.    The Tribunal Improperly Converted Westminster's Claim Against
          Mr. Au, a Non-Party to the Arbitration Agreement, Into a Claim
          Against Petrocom.................................................................... 17

    B.    The Panel Had No Authority To Adjudicate An Unjust Enrichment
          Claim by Westminster Against Petrocom................................. 19

    C.    The Panel Manifestly Disregarded Clearly Applicable Law
          Governing Westminster's Quasi-Contract Claim Against Petrocom ...... 22

  III.    WESTMINSTER IMPROPERLY SEEKS ADDITIONAL RELIEF
       BEYOND THE SCOPE OF THE TRIBUNAL'S AWARD............................... 23

CONCLUSION.................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986)................................................................17

*Banco de Suguros del Estado v. Mutual Marine Office, Inc.*,
  344 F.3d 255 (2d Cir. 2003)....................................................16, 20

*Bell v. Cendant Corp.*,
  293 F.3d 563 (2d Cir. 2002)....................................................21

*Bowmer v. Bowmer*,
  50 N.Y.2d 288 (1980)............................................................20

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*,
  333 F.3d 383 (2d Cir. 2003)....................................................23

*Eighth Ave. Coach Corp. v. City of New York*,
  286 N.Y. 84 (1941)..............................................................20

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995)............................................................17, 19

*Florasynth, Inc. v. Pickholz*,
  750 F.2d 171 (2d Cir. 1984)....................................................25

*Gangel v. De Groot*,
  41 N.Y.2d 840..................................................................20, 22

*Gerling Global Reins Corp. v. Home Ins. Co.*,
  302 A.D.2d 118 (1st Dep't 2002) ..............................................20

*Greenfield v. Philles Records*,
  98 N.Y.2d 562 (2002) ..........................................................13

*Hall Street Assoc., L.L.C. v. Mattel, Inc.*,
  552 U.S. 576 (2008)............................................................25

*Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Local 261*,
  950 F.2d 95 (2d Cir. 1991).....................................................12

*In re Marine Pollution Serv., Inc.*,
  857 F.2d 91 (2d Cir. 1988).....................................................13

*Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*,
   67 F.3d 20 (2d Cir. 1995) ........................................................................................21

*Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*,
   916 F.2d 63 (2d Cir. 1990) ......................................................................................12

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*,
   808 F.2d 930 (2d Cir. 1986) ....................................................................................12

*Minichiello v. Royal Bus. Funds Corp.*,
   18 N.Y.2d 521 (1966) ...............................................................................................23

*Morlee Sales Corp. v. Mfrs. Trust Co.*,
   9 N.Y.2d 16 (1961) ....................................................................................................13

*N.Y. Tel. Co. v. Commc'ns Workers of Am. Local 1100*,
   256 F.3d 89 (2d Cir. 2001) ......................................................................................16

*Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*,
   497 F.3d 133 (2d Cir. 2007) ..............................................................................16, 17

*Robert Stigwood Org., Ltd. v. Atlantic Recording Corp.*,
   83 A.D.2d 123 (1st Dep't 1981) ..............................................................................22

*Sammarco v. Pepsi-Cola Bottling Co.*,
   1 A.D.3d 341 (2d Dep't 2003) ............................................................................20, 22

*Silver v. Pilzer*,
   59 A.D.2d 680 (1st Dep't 1977) ..............................................................................22

*St. Louis Theatrical Co. v. St. Louis Theatrical Bhd. Local 6*,
   715 F.2d 405 (8th Cir. 1983) ..................................................................................15

*Stolt-Nielsen SA v. Animalfeeds Int'l Corp.*,
   548 F.3d 85 (2d Cir. 2008), *rev'd on other grounds*, 130 S. Ct. 1758 (2010) ...................10, 11

*Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*,
   130 S. Ct. 1758 (2010) ........................................................................................11, 12

*Sugerman v. MCY Music World*,
   158 F. Supp. 2d 316 (S.D.N.Y. 2001) ....................................................................23

*Telenor Mobile Commc'ns AS v. Storm LLC*,
   584 F.3d 396 (2d Cir. 2009) ..............................................................................17, 19

*Terwilliger v. Tervillger*,
   206 F.3d 240 (2d Cir. 2000) ..............................................................................13, 15

*Waldron v. Goddess*,
   61 N.Y.2d 181 (1984) .................................................................................................22

*Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*,
   304 F.3d 200 (2d Cir. 2002) ......................................................................................11

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*,
   126 F.3d 15 (2d Cir. 1997) .......................................................................................10

**STATUTES**

9 U.S.C. § 9 ....................................................................................................................25

9 U.S.C. § 10 .................................................................................................1, 3, 10, 16, 25

N.Y. Gen. Oblig. Law § 507(a)(10) ...............................................................................23

Respondents, Petrocom Energy Limited ("Petrocom") and Petrocom Limited, respectfully submit this memorandum of law in support of their motion, pursuant to 9 U.S.C. § 10, to vacate a final arbitration award and in opposition to Westminster Securities Corporation's petition to confirm this award.

## INTRODUCTION

Petrocom does not make this application lightly and is well aware that, when an arbitration panel acts within the scope of its authority in resolving a dispute, its award is subject to review and modification on limited grounds under the Federal Arbitration Act.  As the Supreme Court and the Second Circuit have repeatedly cautioned, however, an arbitrator's award is not immune from all scrutiny under the FAA.  Arbitrators who are given authority by parties to decide contractual disputes are duty-bound to apply the plain terms of the parties' contract, without importing the arbitrators' own notions of "equity" or "fairness" to displace those contractual terms.  Indeed, as the Supreme Court has recently underscored, "when [an] arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice [] his decision may be unenforceable." *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 (2010) (internal quotation marks omitted; upholding vacatur of arbitration award by this Court on ground of "manifest disregard").  And, as the Second Circuit has held, if an arbitral panel issues an award that ignores the clear meaning of contract terms, while "mak[ing] the right noises—noises of contract interpretation," *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 25 (2d Cir. 1997), the award should be vacated or modified to correct this abuse of the arbitrators' authority.

The Final Award issued in this proceeding fits within this and, as shown below, other established exceptions to the general rule that arbitral awards are ordinarily subject to summary confirmation.  The arbitral panel here made several awards to Westminster that are subject to this

general rule under the FAA and that, accordingly, Petrocom is not challenging.  But two of the panel's awards should be vacated as beyond the scope of the panel's authority.

*First*, the panel manifestly disregarded a plain term in the parties' contracts in awarding Westminster $1.5 million in cash and 2.4 million warrants to purchase Petrocom stock.  The panel made this award pursuant to a "tail" provision in one of the parties' Placement Agent Agreements.  This provides for certain compensation to Westminster relating to financing in Petrocom by investors whom Westminster "introduced" to Petrocom.  Critically, however, the tail provision does not go into effect until *termination* of the Agreements, and it is undisputed here that none of the Agreements was ever terminated.  Westminster was therefore not entitled to any compensation pursuant to these tail provisions.  The panel *repeatedly and expressly acknowledged* this plain meaning of the tail provision and also the undisputed fact that the parties had not terminated any of the three Placement Agent Agreements at issue in this dispute.  This created a "problem" for Westminster, to put it mildly (as the panel did), but the panel undertook to fix Westminster's problem by changing the language of the parties' contracts.  Specifically, to attain what the panel thought would be a "fair and equitable" result for Westminster—who was already paid nearly a million dollars in a failed effort as Petrocom's placement agent—the panel chose to read into the Agreements an additional, unenumerated event triggering the tail provision:  namely, "expiration" of the Agreements.  The panel's choice to do this represents far more than mere fact-finding or contract interpretation, but was instead an intentional disregard of a clear contractual term.  This is, Petrocom respectfully submits, one of those exceptional circumstances where, on the face of the award, the arbitrators have manifestly shown that they disregarded a contractual term they were duty-bound to apply.

*Second*, the panel improperly converted Westminster's non-arbitrable claim for unjust enrichment against Petrocom's CEO, who did not sign any of the agreements to arbitrate in his personal capacity, into a claim against Petrocom.  By awarding Westminster $250,000 in cash and an additional 400,000 warrants on this theory, the panel acted far beyond the scope of its authority, which was, by operation of New York law that governs the parties' Agreements, limited to deciding *contractual disputes* between Westminster and Petrocom—and did not extend to unjust enrichment claims based on alleged conduct by a non-party to the Agreements. Here again, the panel candidly acknowledged that this unjust enrichment claim did *not* seek relief within the scope of any of the parties' Agreements.  Over Petrocom's vehement objection, however, the panel blazed ahead with it and awarded Westminster a windfall recovery.

Finally, Westminster's petition improperly asks the Court to issue substantial additional awards that are not even part of the Final Award here.  Westminster, not content with the substantial award that the panel gave it, boldly asked the panel to "modify" the Award by (i) giving Westminster a massive additional sum of pre-Award interest, and (ii) ordering Petrocom to accede to two "form" warrants that Westminster's counsel prepared.  The panel rejected these requests, on the grounds that it had already considered and rejected Westminster's request for pre-Award interest and that Westminster had improperly waited until after the arbitration was closed to seek approval of the warrant "forms."  This Court has no authority to "confirm" these awards that were never even issued by the panel, and this is yet another ground on which Westminster's petition should be denied.

For all of these reasons, and more below, Petrocom respectfully requests that the Court grant this motion to vacate and deny Westminster's petition to confirm the Final Award.

## BACKGROUND

### A.    The Parties' Commercial Relationship

Petrocom, a Cayman Islands company headquartered in Hong Kong, constructs state-of-the-art coal blending facilities using technology that substantially reduces both pollution and energy costs.  (Final Award ¶¶ 1, 29).  Westminster is a boutique investment firm.  (*Id.* ¶ 1).  Petrocom retained Westminster as a non-exclusive financial advisor in May 2005, in hopes that Westminster would assist Petrocom in obtaining the funding it needed to construct its first coal-blending facility.  (*Id.*).  No investments materialized under this agreement.

The parties negotiated a new Engagement Letter in May 2006.  (*Id.*)  Under this agreement, which expressly superseded the prior engagement letter, Westminster became Petrocom's exclusive placement agent "for a period of three (3) years."  (*Id.*)  The May 2006 Engagement Letter anticipated that Westminster would raise $100 million for Petrocom, and set forth the compensation to which Westminster was entitled for this fund raising.  As with the first Engagement Letter, however, no investments materialized under this agreement.

### B.    The Placement Agent Agreements

In light of the failure of this opening round of financing, Petrocom decided to try a new strategy:  a private placement of preferred shares.  (*See* Declaration of Todd R. Geremia, Ex. C at 9).  To that end, Petrocom entered into three separate Placement Agent Agreements with Westminster, under which Westminster agreed to serve as a placement agent for the sale of up to 24 million shares of convertible preferred stock in Petrocom.

The first Placement Agent Agreement, which was executed on June 29, 2006, provided for the placement of a minimum of $5 million and a maximum of $24 million in convertible preferred stock.  (Final Award ¶ 30)  This Agreement, which superseded and replaced the May 2006 Engagement Letter, again designated Westminster as Petrocom's "exclusive agent for all

investment banking transactions." (*Id.* ¶ 33).  Westminster's President and CEO, John O'Shea, signed the June 2006 Agreement for Westminster and also in his personal capacity with respect to one part of the Agreement.  (Geremia Decl. Ex. C at 10).  Howard Au, Petrocom's Chairman and CEO, signed the agreement for Petrocom, but, unlike Mr. O'Shea, did not sign it in his personal capacity.  (*Id.*)

The June 2006 Placement Agent Agreement contained several provisions governing Westminster's compensation, including commissions for the placement of all preferred shares in Petrocom regardless of who placed them, warrants to purchase shares of Common Stock, a monthly advisory fee, and reimbursement of certain expenses.  (Final Award ¶ 31-34).  The Agreement also contained a "tail provision" in its "<u>Termination</u>" section, which provided for the payment of certain fees to Westminster following the Agreement's termination:

> Any termination of this Agreement pursuant to this section shall be without liability of any character . . . on the part of any party hereto, except that . . . until two (2) years following termination of this Agreement, Westminster shall be entitled to receive, and the Company shall be obligated to pay to Westminster, the following fees with respect to any financing in the Company by any entity introduced directly or indirectly to the Company by Westminster or with whom Westminster was working on behalf of the Company at the Company's direction.

(*Id.* ¶ 32).  All told, Westminster was paid a total of $472,761 and raised $7.8 million in connection with this offering, far less than the $24 million required for Petrocom to build its first coal-blending facility.  (*Id.* ¶ 36).

On January 17, 2007, the parties entered into a new Placement Agent Agreement, which called for the issuance and sale of up to $16 million of convertible preferred stock in Petrocom. (*Id.* at ¶ 37).  The January 2007 Placement Agent Agreement contained a tail provision that was identical to the one contained in the June 2006 Agreement.  (Geremia Declaration, Ex. C at 21-

22).  Westminster raised only $1.18 million under the January 2007 Agreement, and was paid commissions of $59,500 for these sales.  (Final Award ¶ 37).

On April 1, 2007, the parties amended the June 2006 Placement Agent Agreement to provide that Westminster would be demoted to a "non-exclusive agent for all investment banking transactions including debt and equity placements."  (*Id.* ¶ 38).  The parties also executed a new Placement Agent Agreement, also dated April 1, 2007, which similarly reflected Westminster's demotion to a non-exclusive agent.  (*Id.*).  As non-exclusive agent, Westminster was provided compensation only for shares that Westminster itself placed.  However, following termination of the Agreement, Westminster would still be provided certain fees and warrants pursuant to the tail provision.  (*Id.*).  Ultimately, Westminster raised $7.02 million under this Agreement, and Petrocom paid Westminster commissions and expenses totaling $397,573.16.  (*Id.* ¶ 39).

Section 8(a) of all three Placement Agent Agreements sets out in detail when and how the Agreements may be terminated.  (*See e.g.*, Geremia Decl., Ex. A § 8(a).).  And, as the Tribunal ruled, none of the Agreements was ever terminated.  All told, Westminster managed to raise approximately $16 million under the three Placement Agent Agreements, which left Petrocom to obtain the remaining financing it needed from other sources.  (Geremia Decl., Ex. C at 14.).

### C.    The AEI Transaction

After Westminster lost its exclusive status as Petrocom's placement agent, Petrocom began actively seeking financing through other channels.  In June 2007, after the private placement of Petrocom's Preferred Stock was complete, Ashmore Energy International ("AEI"), a large, multinational energy concern, expressed interest in becoming a majority shareholder in Petrocom.  (*Id.* at 15).  Petrocom agreed to give AEI a six-week exclusivity period during which Petrocom would not pursue any other transactions and investments.  (Final Award ¶ 86).  AEI, in turn, agreed to purchase $9.5 million in common shares of Petrocom.  (*Id.*).  Petrocom and AEI

then sought to come to terms on an agreement under which AEI would make an additional $80.5 million investment in the company.  (*Id.*).  AEI and Mr. Au, in turn, entered into an agreement pursuant to which, if AEI did not acquire a controlling interest in Petrocom, Mr. Au would use his best efforts to sell the 9.5 million shares that AEI had purchased in Petrocom.  (*Id.*). Westminster was made aware of this agreement at the time and voiced no objection to it. (Geremia Decl., Ex. C at 17).

AEI and Petrocom ultimately failed to reach an agreement regarding a larger investment by AEI.  Although AEI initially intended to resell the 9.5 million common shares itself, AEI was concerned about creating the appearance in the market that it was speculating in Petrocom stock. To that end, Mr. Au agreed to re-purchase, and then resell, the AEI's shares himself.  (Final Award ¶ 87).  On November 30, 2007, Mr. Au purchased the 9.5 million common shares from AEI, and then proceeded to sell these shares to a number of investors ("the AEI Transaction"). (Geremia Decl., Ex. C at 17).  Although Petrocom received funds when AEI purchased the shares in the first instance, it received no funds from Mr. Au's purchase and sale of those shares, which resulted in Mr. Au personally realizing a small net loss.  (*Id.*)

### D.    The Arbitration Proceedings

Westminster commenced these arbitration proceedings on October 15, 2008, claiming that Petrocom owed it certain compensation, expenses, and fees under the three Placement Agent Agreements.[1]  Specifically, Westminster alleged that Petrocom owed it (1) compensation, unpaid expenses, warrants, and advisory fees arising out of the sale of preferred shares pursuant to the Placement Agent Agreements; (2) compensation and warrants under the tail provision; and (3)

---

[1] Each Placement Agent Agreement contains an arbitration clause and provides that New York law governs any dispute concerning the "validity, interpretation and construction" of the Placement Agent Agreements.  (*See e.g.*, Geremia Declaration, Ex. A at § 11(g).)

the reappointment of Westminster's President and CEO to Petrocom's Board.  Westminster also

asserted claims against Mr. Au in his personal capacity for tortious interference with contract and

unjust enrichment, each arising out of the AEI Transaction.

On January 30, 2009, the ICDR appointed a three-arbitrator panel.  Shortly thereafter,

Mr. Au moved to dismiss Westminster's claims against him on the ground that Mr. Au did not

execute any of the Placement Agent Agreements in his personal capacity, and thus was not

bound by the arbitration agreement contained therein.  That agreement plainly limited the panel's

authority to deciding disputes between Westminster and Petrocom.  The panel nevertheless chose

to defer ruling on the issue (*see* Final Award ¶ 10), effectively forcing Mr. Au to mount a full

defense in arbitration to Westminster's improperly asserted claim, and to engage in nearly a year

of prejudicial discovery and motion practice.

The panel conducted arbitration hearings on April 16, 19, and 20, 2010.  During the first

day, the panel dismissed Mr. Au as a respondent, properly concluding that it had no jurisdiction

over Mr. Au as he did not have an agreement to arbitrate with Westminster, (*Id.* ¶¶ 22-28).  The

parties submitted post-hearing briefs on May 21, 2010, and the proceedings were declared closed

on July 21, 2010.  (*See* Tribunal's Nov. 11, 2010 Order).

E.      **The Tribunal's Award**

The panel issued its Final Award on September 16, 2010.  At the outset, the panel (1)

explained its reasons for dismissing Mr. Au, (Final Award at ¶¶ 22-28); (2) awarded

Westminster warrant compensation in connection with the sale of certain preferred shares under

the Placement Agent Agreements, (*id.* at ¶¶ 43-44); and (3) rejected the vast majority of

Westminster's claims for advisory fees and reimbursement of expenses, (*id.* at ¶¶ 45-52).

The panel then turned to Westminster's claims for compensation and warrants arising out

of the purchase of Petrocom shares by third parties that Westminster allegedly introduced to

Petrocom.  (*Id.* ¶ 60).  The only asserted basis for these claims was the tail provision in Section 8(c) of the Placement Agent Agreements, which, as noted, provided for certain compensation with respect "to any financing in the Company by any entity introduced directly or indirectly to the Company by Westminster."  As the panel repeatedly observed in its Award, though, "the tail provisions apply only in the event of *termination*."  (*Id.* ¶ 73 (emphasis in original).)  "This present[ed] a problem for Westminster," the panel candidly observed, "because the Private Placement Agreements were not formally terminated, and Westminster did not treat them as terminated."  (*Id.* at ¶ 72)  To get around this "problem," the panel proceeded to rewrite the tail provision to alternatively trigger upon "*expiration*" of the Agreements, even though nothing in the Agreements so provided.  (Final Award ¶ 73).  On that basis, the Tribunal proceeded to award Westminster $1.5 million in cash compensation and 2.4 million warrants.  (*Id.* ¶ 76)

The panel next turned to Westminster's claim for compensation arising from the AEI Transaction ("the AEI Claim").  As noted above, Westminster originally asserted this claim against Mr. Au in his personal capacity, and the panel dismissed that claim after determining that it lacked jurisdiction over Mr. Au.  The panel nevertheless proceeded to allow Westminster to convert its claim against Mr. Au into one against *Petrocom*, (*see id.* ¶ 90, 95), in disregard of its own ruling dismissing Westminster's claim against Mr. Au.  The panel did so despite its own acknowledgement that Westminster's AEI Claim "is not governed by the Placement Agent Agreements" (*id.* ¶ 94), which provide the sole source of the panel's authority in these proceedings.  Ultimately, the panel awarded Westminster $250,000 and 400,000 warrants on this claim, concluding that the AEI Transaction unjustly enriched *Petrocom*, even though Petrocom was not a party to the buy-back agreement and did not receive *any* of the proceeds from the transaction.  (*Id.* ¶ 96.)  In so doing, the Tribunal did not even address Petrocom's argument that,

under clearly applicable New York law, such claim was foreclosed by the absence of a written agreement providing for fees to Westminster in connection with this transaction.

Both parties timely moved for correction of the Award under Article 30(1) of the ICDR's Rules. Westminster's request sought relief that was either previously denied by the Tribunal or never requested in the first place. Westminster's petition to confirm in this Court then followed. After Westminster filed its petition in this Court, the Tribunal denied both parties' requests for correction by Order dated November 11, 2010 and, specifically, denied Westminster's request for substantial pre-Award interest and for a determination that Petrocom should be required to issue warrants in two forms as drafted by Westminster but never submitted during the arbitration. These are the same forms that Westminster's Petition requests that this Court approve.

## ARGUMENT

## I. THE TRIBUNAL'S AWARD MANIFESTLY DISREGARDS THE CONTRACT AND CLEARLY APPLICABLE LAW.

The Tribunal awarded Westminster $1.5 million in cash and 2.4 million warrants on the basis of its rewriting of the "tail" provision in the parties' Agreements. This award, in manifest disregard of the terms of the Agreement, should be vacated.

### A. An Award That Is Predicated on the Arbitrators' Manifest Disregard of the Contract or the Applicable Law Should Be Vacated

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-11, requires vacatur of arbitration awards "where the arbitrators were guilty of . . . misbehavior by which the rights of any party have been prejudiced," 9 U.S.C. § 10(a)(3), and "where the arbitrators exceeded their powers," 9 U.S.C. § 10(a)(4). Such grounds are met where the arbitration award exhibits a "manifest disregard" of the law, *see Stolt-Nielsen SA v. Animalfeeds Int'l Corp.*, 548 F.3d 85, 91, 95 (2d Cir. 2008), *rev'd on other grounds*, 130 S. Ct. 1758 (2010), or the terms of the parties' agreement. *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 24

(2d Cir. 1997) ("Awards may be vacated, *see* 9 U.S.C. § 10, or modified, *see id.* § 11, in the limited circumstance where the arbitrator's award is in manifest disregard of the terms of the agreement.").  Indeed, the Supreme Court has recently made clear, in the context of upholding a district court's vacatur of an arbitration award on the ground of manifest disregard, that an arbitrator may not stray from the terms of the parties' agreement and "dispense[] his own brand of industrial justice."  *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 (2010) (internal quotation marks omitted).

In accordance with this principle, the Second Circuit has held that "vacatur for manifest disregard of a commercial contract is appropriate" where "the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract."  *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 214 (2d Cir. 2002).  The standard for assessing whether an award was in manifest disregard is whether (1) the law at issue "was clear, and in fact explicitly applicable to the matter before the arbitrators," (2) "the law was in fact improperly applied, leading to an erroneous outcome," and (3) the arbitrator "must have known of [the applicable law's] existence, and its applicability to the problem before him," *Stolt-Nielsen*, 548 F.3d at 93. Although these and other grounds for vacatur of an arbitration award present a "high hurdle," *Stolt-Nielson*, 130 S. Ct. at 1767, that hurdle has been cleared by the arbitrators' exceptional ruling here.

### B.     The Panel Manifestly Disregarded the Tail Provision and New York Law

The panel's Award repeatedly and unequivocally acknowledged that, consistent with the Agreements' express and unambiguous language, the tail provision went into effect only after *termination* of the Agreements.  For example:

- "[T]he tail provisions apply only in the event of *termination*."  (Final Award ¶ 73 (emphasis in original);

- "Section 4 of the Engagement Letter also contained a tail provision, which provided for certain compensation following the termination of the agreement." *Id.* ¶ 29;

- "The tail provisions apply by their terms following termination of the Private Placement Agreements." *Id.* ¶ 72.

Indeed, as the panel candidly acknowledged, the tail provision's express language "presents a problem for Westminster, because *the Private Placement Agreements were not formally terminated*, and Westminster did not treat them as terminated."  (*Id.*) (emphasis added).

Despite having expressly acknowledged that (i) the tail provisions go into effect only in the event of termination of the Agreements; and (ii) none of the Agreements had ever been terminated, the panel proceeded to disregard that termination is the exclusive basis for triggering the tail provision and add another event—"expiration" of the Agreements—as a trigger.  But the panel just made this up.  The term "expiration" does not appear *anywhere* in the tail provision, let alone as a triggering event.  Indeed, as noted, the tail provision is in a section of the Agreement titled "Termination."  The panel, however, thought that it would be "fair and equitable" to "apply the tail provisions in the context of de facto expiration."  (*Id.* ¶ 73).

This ruling and the award based on it is in manifest disregard of the parties' Agreements and the law, and should not be permitted to stand.  The panel's ruling on this issue reflects far more than a mere "error or misunderstanding with respect to the law," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986), but was instead a calculated

and intentional disregard of the plain terms of the parties' Agreement and bedrock notions of contract interpretation.[2]

Under New York law, which governs the "validity, interpretation, and construction" of the Placement Agent Agreements, a contract must of course be read "according to the plain meaning of its terms." *See Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002) ("a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms"). Consistent with this notion, New York courts have long cautioned against redrafting a contract or adding a term to it "for the dispensation of equity upon the facts of a given case." *Terwilliger v. Tervilliger*, 206 F.3d 240, 245 (2d Cir. 2000); *see also Morlee Sales Corp. v. Mfrs. Trust Co.*, 9 N.Y.2d 16, 19 (1961) ("Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (quotation marks omitted).

That is exactly what the panel did here. As the panel acknowledged, under the express and unambiguous language of the Placement Agent Agreements, the tail provision does not go into effect until *termination* of those Agreements. This means what it says. The tail provision does not identify any other triggering event, nor does it make any reference to "expiration" of the Agreements as a triggering event. The placement of the tail provision in the "Termination" section of all three Agreements further bolsters this plain meaning, as does the fact that the tail

---

[2] *See Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Local 261*, 950 F.2d 95, 99 (2d Cir. 1991) (vacating arbitration award that was "not based on express or properly-implied terms, but rather was improperly based upon the Panel members' particular notions of industrial justice"); *Leed Architectural Prods., Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63, 65-66 (2d Cir. 1990) (vacatur is appropriate where the arbitrator disregarded the terms of the parties' agreement); *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 96 (2d Cir. 1988) (vacatur appropriate where arbitrator "did not purport to base his award on any express or implied term in the collective bargaining agreement").

provision itself is in a paragraph that begins with the sentence "[a]ny termination of this Agreement pursuant to this section shall be without liability of any character."  The paragraph then goes on to describe a consequence of "termination," namely, that the tail provision will be triggered.  Accordingly, under the plain terms of the parties' Agreement and clearly applicable New York law, the tail provision has not been triggered, and cannot form any basis for Westminster to recover fees or warrants from Petrocom.

The panel pointed to the Agreements' survival clause as putative support for its choice to disregard the plain language of the tail provision.  The survival clause states that "certain provisions of this Agreement," including the tail provision and many other provisions, "must survive any termination or expiration thereof in order to be fair and equitable to the party to whom any promise or duty to perform is owed."  (*See*, *e.g.*, Geremia Decl., Ex. A § 11(k)).  But the survival clause does not justify reading a term into the tail provision that is not there.

*First*, although the panel alluded to how "the Private Placement Agreements are imperfectly drafted and structured" and contain "ambiguities and internal illogic" (Final Award ¶ 71), the panel *never* concluded that the *tail provision itself* is ambiguous.  To the contrary, the panel acknowledged that the tail provision unambiguously provides for compensation only in the event of "termination."  And, although the savings clause itself contemplates several provisions of the contract "surviving" either termination or expiration "for the term required to meet and satisfy any obligations and promises arising" under those specific sections, that does not mean that the tail period *goes into effect* on either termination or expiration.  At most, the language in the survival clause explains *why* the tail provision survives for two years after termination, but not *when* it goes into effect.  That latter question is quite clearly answered, as the Tribunal

acknowledged, by the tail provision itself:  "[t]he tail provisions apply by their terms following termination of the Private Placement Agreements."  (*Id.* ¶ 72).

*Second*, although the panel made much of the fact that the Agreements each have expired, that says nothing about whether the parties intended the tail provision to be triggered by the additional event of expiration.  To the contrary, this only underscores that "termination" and "expiration" of the Agreements are distinct concepts.  Indeed, the record before the panel showed that tail provisions in placement agent agreements are sometimes triggered either by "termination" or "expiration," but that the tail provision in *these* Placement Agent Agreements were not written that way.  If anything, the survival clause thus demonstrates that "termination" and "expiration" are distinct concepts and that the Tribunal should not have added "expiration" as a triggering event when that's not what the tail provision says.

*Third*, while the Tribunal stated its view that "were the tail provisions not to apply, an inequitable commercial situation would arise" (*Id.* ¶ 71), under New York law the arbitrators were not permitted to "redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case."  *Terwilliger*, 206 F.3d at 245; *see also St. Louis Theatrical Co. v. St. Louis Theatrical Bhd. Local 6*, 715 F.2d 405, 409 (8th Cir. 1983) (vacating arbitration award where "the arbitrator's opinion reflected the arbitrator's efforts to balance the equities of the situation, rather than to interpret and apply the agreement").  Indeed, the panel tacitly acknowledged that its Award was not supported by the express language of the tail provision, instead concluding that "it would be fair and equitable, within the meaning and mandate of [the survival clause], to apply the tail provisions in the context of de facto expiration."  (Final Award ¶ 73)  But there is nothing "fair and equitable" about rewriting a contract to change its plain language and in a manner inconsistent with clearly applicable law.

In short, neither the survival clause nor the panel's own notions of fairness can overcome the panel's duty to interpret the Agreements as written.  To be sure, the scope of this Court's review of arbitration awards is narrowly limited.  *See Banco de Suguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003).  "A decision of an arbitrator, however, is not totally impervious to judicial review."  *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007).  The panel's expressly acknowledged choice to "ignore the plain language of the contract," *United Paperworkers*, 484 U.S. at 38, shows that this is one of those relatively rare instances where the panel's Award resulted from a manifest disregard of the parties' Agreements and applicable law.  *See N.Y. Tel. Co. v. Commc'ns Workers of Am. Local 1100*, 256 F.3d 89, 93 (2d Cir. 2001) (vacating award where arbitrator "explicitly rejected" clearly applicable precedent "relying instead on two (more recent) opinions from outside this Circuit").

The panel's improper award to Westminster of $1.5 million in cash and 2.4 million warrants should therefore be vacated.

## II.      THE TRIBUNAL EXCEEDED ITS AUTHORITY BY ADJUDICATING A NON-ARBITRABLE CLAIM BY WESTMINSTER FOR UNJUST ENRICHMENT

The panel also exceeded the scope of its authority by awarding Westminster $250,000 in cash and 400,000 warrants on a theory of unjust enrichment against Petrocom.

"A paramount question for reviewing courts is whether the arbitral panel has acted within the bounds of its authority."  *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 140 (2d Cir. 2007).  "The authority of the arbitral panel is established only through the contract between the parties who have subjected themselves to arbitration, and a panel may not exceed the power granted to it by the parties in the contract."  *Id.*  Where, as here, "the arbitrator goes

beyond that self-limiting agreement between consenting parties, it acts inherently without power, and an award ordered under such circumstances must be vacated."  *Id.*

The panel exceeded its authority on this unjust enrichment award in three critical ways. *First*, it permitted Westminster to convert its unjust enrichment claim against Mr. Au into one against Petrocom, after the panel ruled that it had no jurisdiction over Mr. Au.  By allowing Westminster to do this, and by awarding Westminster relief on this basis, the panel acted far beyond the scope of its authority, which was expressly limited under the Agreements to deciding disputes between Westminster and Petrocom.  *Second*, the panel exceeded the power granted to it by the arbitration agreement by adjudicating claims which it acknowledged were not governed by the parties' Agreements.  *Third*, even if the panel did not exceed its authority in adjudicating Westminster's AEI claim—which it did —vacatur would still be warranted in light of the panel's manifest disregard of well-settled New York law governing that claim.

### A. The Tribunal Improperly Converted Westminster's Claim Against Mr. Au, a Non-Party to the Arbitration Agreement, Into a Claim Against Petrocom

"[A]rbitration is a matter of contract," *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986), and "[a] dispute is arbitrable only if the parties contractually bind themselves to arbitrate it," *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405-06 (2d Cir. 2009) ("A question of arbitrability is therefore raised when, as here, someone asserts that an arbitral award should not be enforced because there was no effective agreement to arbitrate that dispute."); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ("the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute").

The panel's authority here was expressly limited to deciding disputes between *Westminster* and *Petrocom*.  The only agreement to arbitrate at issue here is the arbitration

provision contained in all three Placement Agent Agreements.  That provision states that "the parties hereto" agree to arbitrate their disputes under the Agreements, and that the validity, interpretation, and construction of the Agreements shall be governed by New York law.  (*See*, *e.g.*, Geremia Decl., Ex. A at § 11(g).)  Each of the Agreements was executed by Petrocom and Westminster, with the respective CEO of each party signing on behalf of the companies.  (*See*, *e.g.*, Geremia Decl., Ex. A at WES-P 0231).  Westminster's CEO also executed the June 2006 Agreement in his personal capacity, thus showing that the parties understood how to bind an individual in that manner.  (*See* Geremia Decl., Ex. C at 10).

It is undisputed, however, that Mr. Au did *not* execute any one of the Placement Agent Agreements in his personal capacity.  (*See id.*). On that basis, Mr. Au moved at the outset of the arbitration proceeding to dismiss Westminster's claims against him relating to the AEI Transaction.  Although the panel's authority was plainly limited under the Agreements to resolving disputes between Westminster and Petrocom, the panel chose to defer ruling on the issue (*see* Final Award at 4), effectively forcing Mr. Au into arbitration and to mount a full defense on the merits to Westminster's improperly asserted claim.

After nearly a year of highly prejudicial discovery and motion practice, the Tribunal ultimately dismissed Mr. Au as a respondent on the first day of the hearings and finally acknowledged that it had no authority over Westminster's claim against Mr. Au. (Final Award ¶ 28).  The panel's consideration of this claim should have ended there, as there plainly "was no effective agreement to arbitrate that dispute."  *Telenor Mobile Commc'ns*, 584 F.3d at 406.  But, over Petrocom's objection, the Tribunal proceeded to allow Westminster to convert its claim against Mr. Au into one against *Petrocom*, (*see id.* ¶¶ 90, 95), in disregard of its own decision dismissing Westminster's claim against Mr. Au.  By allowing Westminster to continue to pursue

this claim—and by ultimately making an award to Westminster on that basis—the panel far

exceeded the scope of its authority, which was limited to deciding disputes between Westminster

and Petrocom.  This backdoor attempt to adjudicate a non-arbitrable claim against a non-party to

the arbitration agreement cannot withstand this Court's scrutiny under the FAA.

### B. The Panel Had No Authority To Adjudicate An Unjust Enrichment Claim by Westminster Against Petrocom

The panel likewise had no authority over the very subject matter of Westminster's AEI

Claim, which falls outside the scope of the parties' agreement to arbitrate disputes concerning

the "validity, interpretation and construction" of the Placement Agent Agreements.  Although the

panel acknowledged that this claim "is not governed by the Placement Agent Agreements," (*Id.*

at ¶ 94), it nevertheless proceeded to grant Westminster relief with respect to that claim.  In so

doing, the panel acted beyond its authority.  For this reason, too, the Award must be vacated.

To decide whether the parties agreed to arbitrate a dispute, courts "should apply ordinary

state-law principles that govern the formation of contracts."  *First Options*, 514 U.S. at 942

(1995).  The parties' Placement Agent Agreements make clear that New York law applies to

"each part" of the Agreement, including the agreement to arbitrate.  And, under well-settled New

York law, which governs here, "the rule is clear that unless the agreement to arbitrate expressly

and unequivocally encompasses the subject matter of the particular dispute, a party cannot be

compelled to forego the right to seek judicial relief and instead submit to arbitration."  *Bowmer v.*

*Bowmer*, 50 N.Y.2d 288, 293-94 (1980); *see also Sammarco v. Pepsi-Cola Bottling Co.*, 1

A.D.3d 341, 342 (2d Dep't 2003).  Put another way, "an arbitration clause must be read

conservatively if it is subject to an equivocal reading. . . .  The agreement to arbitrate must be

***express, direct, and unequivocal*** as to the issues or disputes to be submitted to arbitration."

*Gangel v. De Groot*, 41 N.Y.2d 840. 841 (1977) (emphasis added).  The burden also rests

squarely on Westminster to show that any claims it sought to arbitrate were arbitrable.  *See*

*Gerling Global Reins Corp. v. Home Ins. Co.*, 302 A.D.2d 118, 123 (1st Dep't 2002).

Here, the panel's Award with respect to Westminster's AEI claim "exceed[s] the power

granted to [it]" by the parties' arbitration agreement, *Banco de Seguros del Estado v. Mut.*

*Marine Office, Inc.*, 344 F.3d 255, 262 (2d Cir. 2003), and should be vacated.  The parties'

arbitration agreement provides that

> The *validity, interpretation and construction of this Agreement*,
> and each part hereof, will be governed by the local laws of the
> State of New York, without giving effect to its conflict of law
> principles or rules.  *In the event of a dispute, the parties hereto*
> *agree to be bound by the arbitration procedures of the American*
> *Arbitration Association*, and that such arbitration shall take place
> in the New York metropolitan area.

(Geremia Decl., Ex. C § 12(g) (emphasis added).)  New York law requires each clause in this

provision to be read in the context of surrounding clauses and the agreement as a whole, *see*, *e.g.*,

*Eighth Ave. Coach Corp. v. City of New York*, 286 N.Y. 84, 88-89 (1941), and provides that "the

specific provisions [of a contract] tend to restrict the general," *Bowmer*, 50 N.Y.2d at 294.  Thus,

read properly in context with the preceding sentence that addresses how to resolve contractual

issues, Westminster's and Petrocom's agreement to arbitrate "[i]n the event of a dispute" should

be limited to disputes concerning the "validity, interpretation and construction" of the Placement

Agent Agreements.  The parties here did not agree, for instance, that they would arbitrate "any

and all disputes," or otherwise express an intent to arbitrate "[a]ny controversy arising in

connection with or relating to this Agreement . . . *or any other matter or thing*."  *Bell v. Cendant*

*Corp.*, 293 F.3d 563, 565 (2d Cir. 2002) (construing Connecticut law).

Westminster's AEI claim, which sounds in quasi-contract, does not involve a dispute

between Westminster and Petrocom concerning the "validity, interpretation and construction" of

the Placement Agent Agreements, but instead "implicate[] matters beyond the contractual

performance of the parties." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 28 (2d Cir. 1995) (concluding that plaintiff's defamation claim was not governed by the parties' arbitration agreement, even though that claim was "factually quite closely related to the contract claims").  Westminster itself conceded this point in the arbitration, having repeatedly emphasized that "the Placement Agent Agreements between Westminster and Petrocom do not govern Petrocom's actions with regard to Grand River and RimAsia."  (Westminster Post-Hearing Brief at 34; *see id.* at 35 ("this specific behavior is not governed by the Placement Agent Agreement between Petrocom and Westminster")).  The panel likewise acknowledged that "Westminster's unjust enrichment claim is not governed by the Placement Agent Agreements, as those agreements deal only with compensation for a "financing" in Petrocom (which Mr. Au's sale of shares to Grand River, GRC Partners or RimAsia was not)."  (Final Award ¶ 94; *see id.* ¶ 91 ("Westminster cannot rely on the tail provision in the Private Placement Agreements since that provision contemplates the payment of compensation only in the event of a 'financing in the Company' and it is clear that there was no "financing in the Company' resulting from the purchase of Mr. Au's shares.").)

In any event, there is no "express, direct, and unequivocal" indication in the Placement Agent Agreements that Petrocom and Westminster intended to submit to arbitration all claims in tort and equity that they might assert against each other.  *See Gangel*, 41 N.Y.2d at 841; *see also Sammarco*, 1 A.D.3d at 342 (tort claim was not "expressly and unequivocally" covered by agreement to arbitrate disputes "concerning the interpretation" of a commercial agreement).  At best for Westminster, the arbitration clause is equivocal as to whether it covers such claims between Westminster and Petrocom; and, under New York law, an equivocal arbitration clause is construed *against* arbitration.  *See Gangel*, 41 N.Y.2d at 841; *Robert Stigwood Org., Ltd. v.*

*Atlantic Recording Corp.*, 83 A.D.2d 123, 126 (1st Dep't 1981)  (arbitration clause that was "subject to varying reasonable constructions" did not compel arbitration).

Indeed, "the threshold for clarity of agreement to arbitrate is greater than with respect to other contractual terms." *Waldron v. Goddess*, 61 N.Y.2d 181, 185 (1984) (quotation marks omitted).  That high threshold was not met by the Placement Agent Agreements here, and so Westminster's unjust enrichment claim against Petrocom was not arbitrable.  *See also Robert Stigwood Org., Ltd.*, 83 A.D.2d at 126-127 ("[T]he parties did not intend to have every possible dispute go to arbitration."); *Silver v. Pilzer*, 59 A.D.2d 680 (1st Dep't 1977) ("This court will not by implication or construction extend the scope of the agreement to arbitrate.")

For this independent reason, the panel's award to Westminster of $250,000 and 400,00 warrants on an unjust enrichment theory against Petrocom should be vacated.

### C.    The Panel Manifestly Disregarded Clearly Applicable Law Governing Westminster's Quasi-Contract Claim Against Petrocom

The magnitude of the panel's error in permitting Westminster to convert its non-arbitrable claim against Mr. Au into one against Petrocom is only heightened by the panel's manifest disregard of clearly applicable law in adjudicating that claim.  Specifically, after holding that Westminster could pursue its AEI Claim against Petrocom, the panel concluded that Westminster was entitled to recover on that claim based on an unjust enrichment theory.

It is well settled under New York law, however, that finder's fees agreement must be in writing under New York's statute of frauds, N.Y. Gen. Oblig. Law § 507(a)(10).  *See also Minichiello v. Royal Bus. Funds Corp.*, 18 N.Y.2d 521, 527 (1966).  Accordingly, where there is an agreement between the parties as to the fees owed to a placement agent—as there was here—the terms of that relationship are defined exclusively by the written agreement, and attempts to avoid the application of that agreement by claiming "unjust enrichment" are barred.  *See*

*Sugerman v. MCY Music World*, 158 F. Supp. 2d 316, 326 (S.D.N.Y. 2001) (holding that "[q]uasi-contract claims are barred by GOL § 507(a)(10)").

This legal authority was put before the panel (*see* Respondents' Detailed Statement of Defense and Counterclaim at 43), but in awarding Westminster relief on its unjust enrichment theory the panel ignored it.  The panel's decision to allow Westminster to recover on a quasi-contract claim against Petrocom was thus not only a broad overreach of the panel's authority, but was also in manifest disregard of the law, as the panel was "fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it."  *Duferco*, 333 F.3d at 389.

## III.   WESTMINSTER IMPROPERLY SEEKS ADDITIONAL RELIEF BEYOND THE SCOPE OF THE TRIBUNAL'S AWARD.

In its petition to confirm the Final Award, Westminster asked this Court to issue substantial additional awards that were either previously denied by the panel or never requested during the course of the arbitration proceedings.  (*See* Petition to Confirm Arbitration Award and Entry of Judgment Thereon, at 5 §§ (iii) – (v).)  Westminster now concedes that much of this additional relief—including its request for a substantial amount of pre-Award interest—is barred by the Tribunal's post-Award order denying Westminster's request to modify the Award.  (*See* Nov. 19, 2010 Declaration of Barry R. Lax, ¶ 7.)  In its supplemental submission, however, Westminster makes no mention of its request that this Court "[a]pprov[e] the forms of warrant" attached to the petition (Petition at 5 § (iii)), and apparently persists in its mistaken belief that this Court has the authority to do so.  Westminster is wrong.

The first time Westminster sought approval of the form of the warrants to be issued under the Placement Agent Agreements was on October 20, 2010, three months *after* the ICDR declared the arbitration proceedings closed and a month after the panel issued its Final Award.

Westminster did so on the basis of two lengthy documents that it had never submitted into evidence either before or during the hearing.  The ICDR Rules under which the parties conducted their arbitration expressly limit post-award relief to interpreting the award, correcting any "clerical typographical or computation errors," and the making of "an additional award as to claims presented but omitted from the award."  ICDR Art. 30(1).  Westminster's belated request for approval of the form of warrants—which were never previously submitted to the panel—was thus a request for substantive relief beyond the scope of the panel's authority, as the panel ruled.

Notwithstanding that ruling, Westminster apparently still wants *this Court* to enter an order with respect to the form of warrants to be issued under the Placement Agent Agreements.  The Court lacks such authority on this petition.  The FAA allows for confirmation of an arbitration award "unless the award is vacated, modified, or corrected as prescribed" in Sections 10 and 11 of the Act.  9 U.S.C. § 9.  Sections 10 and 11 of the FAA, in turn, "suppl[y] mechanisms for enforcing *arbitration awards*:  a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it."  *Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008) (emphasis added); *see* 9 U.S.C. §§ 10-11.  The categories of review set forth in Sections 10 and 11 of the FAA "provide exclusive regimes for the review provided by [the FAA]," *Hall Street*, 552 U.S. at 590, and a party thus cannot ask a district court to order relief beyond that which is in the arbitration award presented for confirmation.  *See generally Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984) ("[T]he confirmation of an award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.").

Westminster's request for approval of the form of warrants thus amounts to an improper attempt to obtain relief beyond that which the panel has ordered or could order and that this Court can provide.  For this additional reason, Westminster's petition should be denied.

## CONCLUSION

Petrocom's motion to vacate the Final Award should thus be granted, and Westminster's petition to confirm the Final Award should be denied.

Dated: December 10, 2010
      New York, New York              Respectfully submitted,

                                  JONES DAY

By:_____
          Todd R. Geremia (TG 4454)
          Laura W. Sawyer (LS-4385)
          222 East 41st Street
          New York, New York 10017
          (212) 326-3939

          *Attorneys for Respondents,*
          *Petrocom Energy Limited and Petrocom*
          *Limited*