```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         :
WESTMINSTER SECURITIES CORP.,            :
                   Petitioner,           :
                                         :      10 Civ. 7893 (DLC)
          -v-                            :
                                         :      OPINION & ORDER
PETROCOM ENERGY LIMITED, and             :
PETROCOM LIMITED,                        :
                   Respondents.          :
                                         :
----------------------------------------X
```

APPEARANCES:

For Petitioner:

Barry R. Lax
Brian J. Neville
Lax & Neville, LLP
1412 Broadway, Suite 1407
New York, NY 10018

For Respondent:

Todd R. Geremia
Laura W. Sawyer
Jones Day
222 East 41st Street
New York, NY 10017

DENISE COTE, District Judge:

    Petitioner Westminster Securities Corporation ("Westminster") has filed a petition to confirm an arbitration award (the "Award") arising out of its service as financial adviser and placement agent to respondents Petrocom Energy

Limited and Petrocom Liminted (collectively, "Petrocom").[1]  Petrocom has moved to vacate the Award.  For the following reasons, Petrocom's motion to vacate the Award is denied and Westminster's petition to confirm the Award is granted.

## BACKGROUND

Westminster is a New York-based boutique investment firm that specializes in raising capital for private Chinese companies.  Petrocom Energy Limited is a Cayman Islands company headquartered in Hong Kong; its parent company, Petrocom Limited, is a Hong Kong company with its principal place of business in Hong Kong.  Petrocom is in the business of constructing coal blending facilities in China.

By an engagement letter dated May 24, 2005 (the "2005 Letter"), Petrocom retained Westminster as a non-exclusive financial adviser.  On May 10, 2006, the parties entered into a new engagement agreement which superseded the 2005 Letter (the "2006 Letter") and which made Westminster Petrocom's <u>exclusive</u> placement agent "for all investment banking transactions, including debt and equity placements for a period of three (3) years."  The 2006 Letter contemplated that Westminster would raise $100 million for Petrocom through one or more offerings of

---

[1] Westminster originally petitioned the Court to approve the forms of warrant attached to its petition as exhibits, but it has abandoned that request.

its securities.  Under the terms of the 2006 Letter, Westminster would receive both 5% of the gross proceeds from each sale of common stock or equity securities and warrants to purchase 8% of the shares sold in any financing.

On June 29, 2006, the parties entered into a private placement agreement which superseded the 2006 Letter (the "2006 Agreement") and provided that Westminster would be Petrocom's "exclusive agent for all investment banking transactions, including debt and equity placements."  The 2006 Agreement similarly provided for basic compensation in the form of 5% of gross proceeds and warrants to purchase 8% of the shares in any given financing; it also contained provisions for a monthly advisory fee and the reimbursement of Westminster's expenses in connection with the securities offerings.  The 2006 Agreement contained a so-called "tail provision" providing for Westminster's compensation in the event of the agreement's termination:

> [U]ntil two (2) years following any termination of this Agreement, Westminster shall be entitled to receive, and the Company shall be obligated to pay to Westminster, the following fees with respect to any financing in the Company by any entity introduced directly or indirectly to the Company by Westminster or with whom Westminster was working on behalf of the Company at the Company's direction:  (i) 5% of the gross proceeds of each closing of such financing, payable at each closing, and (ii) warrants to purchase 8% of the total Common Stock issued and issuable from such financing . . . .

3

Section 8(c) (Emphasis supplied.)  The 2006 Agreement also contained a survival clause which provided

> The parties acknowledge that <u>certain provisions of this Agreement must survive any termination or expiration thereof</u> in order to be fair and equitable to the party to whom any promise of duty to perform is owed under such provision prior to such <u>termination or expiration</u> of the Agreement. Therefore, the parties [sic] <u>the provisions of Sections</u> 1, 2, 3, 4, 5, 7, <u>8(c)</u>, 10, 11, and 12 <u>shall survive the termination or expiration</u> of this Agreement for the period required to meet and satisfy any obligations and promises arising therein and thereunder.

(Emphasis supplied.)  The offering carried out pursuant to the 2006 Agreement raised $7.8 million in financing for Petrocom. Petrocom paid Westminster $472,761 in commission and expenses, but did not pay any advisory fees or issue any warrants under the 2006 Agreement.

The parties entered into a new private placement agreement on January 17, 2007 (the "January 2007 Agreement") which was identical to the 2006 Agreement except for its lack of provision for a monthly advisory fee.  On April 1, 2007, the parties amended the 2006 Agreement to provide that Westminster would become the "non-exclusive agent for all investment banking transactions including debt and equity placements" and to disclaim any right to additional advisory fees.  The parties also entered into a new placement agreement (the "April 2007 Agreement") which "differed from the 2006 and January 2007

Private Placement Agreements in that it provided for compensation to Westminster only for 'sale of the Preferred Shares <u>by the Placement Agent</u>.'"  The offering conducted pursuant to the April 2007 Agreement closed on May 21, 2007.

After the closing of the April 2007 offering, Westminster facilitated additional financing and purchases of Petrocom shares.  The extent of Westminster's involvement in securing this third-party financing is a matter of dispute between the parties, but the transactions at issue here are (1) Petrocom share purchases totaling $30 million by two entities, Standard Bank and Investec; (2) an $8 million credit line extended by Standard Bank and $30 million in "banking facilities" provided by a company called Natixis; and (3) the sale by Howard Au, Petrocom's Chief Executive Officer and Chairman, of 9.5 million Petrocom shares to three entities:  Grand River Capital Investment Co. Ltd., GRC Partners Ltd., and RimAsia Capital Partners, L.P.  The shares sold by Au were originally issued by Petrocom to AEI Asia Limited (AEI) in July 2007.  When it purchased the Petrocom shares, AEI entered into a separate agreement with Au that provided that Au would use his "best efforts" to sell the shares in the event that AEI was unable to make additional investments in Petrocom.  AEI subsequently invoked the best efforts clause; Au purchased AEI's shares and sold them to five entities in December 2007, three of which are

Grand River Capital Investment Co. Ltd., GRC Partners Ltd., and RimAsia Capital Partners, L.P.  Westminster played a role in locating these purchasers of Au's shares.

The 2006 Agreement, the April 2007 Agreement, and the January 2007 Agreement each contain an arbitration clause which provides in relevant part that

> The validity, interpretation and construction of this Agreement, and each part hereof, will be governed by the local laws of the State of New York, without giving effect to its conflict of law principles or rules.  <u>In the event of a dispute</u>, the parties hereto agree to be bound by the arbitration procedures of the American Arbitration Association, and that such arbitration shall take place in the New York City metropolitan area.

On October 15, 2008, Westminster commenced arbitration by submitting claims for the following: (1) warrant compensation, unpaid expenses, and monthly advisory fees for transactions for which Petrocom had already paid Petrocom 5% of gross proceeds under the private placement agreements; (2) compensation for the three financing transactions that took place after the closing of the April 2007 offering, as discussed above; and (3) the appointment of Jim O'Shea to the board of Petrocom.  Petrocom denied that it owed Westminster any additional compensation and claimed that Westminster had breached the placement agreements by selling securities in jurisdictions where it was not licensed to do so.

6

On September 16, 2010, the arbitration panel issued the Award. It granted in part Westminster's claims for warrant compensation, advisory fees, and expenses stemming from transactions for which Westminster had already been partially compensated by Petrocom. It issued an award of costs in favor of Westminster with respect to the issue of the appointment of O'Shea to the board of Petrocom. The panel also awarded 40% of Westminster's attorneys' fees and costs. Petrocom does not challenge these decisions in its motion to vacate.

The arbitration panel found in favor of Westminster on its claims for compensation for the transactions completed after the April 2007 offering. The panel acknowledged that the tail provision of all three placement agreements only applies in the event of a <u>termination</u> of those agreements, and that none of the three agreements was formally terminated or treated as terminated by Westminster. But the panel also recognized that "the Private Placement Agreements must be considered effectively <u>expired</u> when no further action or performance was possible or owed." (Emphasis supplied.) It noted that the agreement's survival clause provides for the survival of the tail provision in the event of the agreement's termination <u>or</u> expiration, and found that the survival clause must be read in conjunction with the tail provision to "apply the tail provisions in the context of de facto expiration, as occurred here." Thus, it found that

7

Westminster was entitled to compensation under the tail provision for the transactions that took place after the April 2007 offering closed.

With respect to the purchase of Au's Petrocom shares, the arbitration panel noted that the tail provision of the placement agreements did not apply to this sale because "that provision contemplates the payment of compensation [to Westminster] only in the event of a 'financing in the Company' and it is clear that there was no 'financing in the Company' resulting from the purchase of Mr. Au's shares."  The panel found that Westminster could recover on an unjust enrichment theory, however, because it expended effort in introducing Au to the entities which ultimately purchased his shares.

Petrocom argues that the arbitration panel acted in manifest disregard of settled law when it held that the tail provision of the placement agreements applied to the transactions.  Petrocom further contends that the arbitration panel lacked the authority to adjudicate Westminster's claim stemming from the purchase of Au's Petrocom shares because, as the panel acknowledged, the sale was not governed by the tail provision of the placement agreements.

On October 15, 2010, Westminster filed a petition to confirm the Award.  Petrocom filed a motion to vacate the Award on December 10.

8

DISCUSSION

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., provides a "streamlined" process for a party seeking "a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it."  Hall Street Assocs. L.L.C. v. Mattel, Inc., 552 U.S. 576, 582 (2008).  Under § 9 of the FAA, "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11."  Id. (quoting 9 U.S.C. § 9).  Section 10(a) of the FAA sets forth four situations in which a court may vacate an arbitration award, only one of which is invoked by Petrocom in its motion to vacate:  "[W]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made."  9 U.S.C. § 10(a)(4).

The Court of Appeals for the Second Circuit has "consistently accorded the narrowest of readings to [§ 10(a)(4)], in order to facilitate the purpose underlying arbitration:  to provide parties with efficient dispute resolution, thereby obviating the need for protracted litigation."  ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co., 564 F.3d 81, 85 (2d Cir. 2009) (citation omitted) ("ReliaStar").  Thus, a party seeking vacatur of an arbitration

9

panel's decision "must clear a high hurdle." Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 (2010). It is not enough "to show that the panel committed an error -- or even a serious error. It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." Id. (citation omitted).

Under § 10(a)(4), the proper inquiry is therefore "whether the arbitrator's award draws its essence from the agreement to arbitrate . . . . If the answer to this question is yes, . . . the scope of the court's review of the award itself is limited." ReliaStar, 564 F.3d at 85-86 (citation omitted). The court does "not consider whether the arbitrators correctly decided the issue" and should "uphold a challenged award as long as the arbitrator offers a barely colorable justification for the outcome reached." Id. at 86 (citation omitted). Thus, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error in resolving the disputed issue does not suffice to overturn his decision." Id. (citation omitted).

Courts in this circuit have also vacated arbitration awards that are in "manifest disregard of the law." See T. Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir.

10

2010).  While the future of the "manifest disregard" standard is unsettled, see Stolt-Nielson, 130 S. Ct. at 1768 n.3 (stating that the Supreme Court would "not decide whether 'manifest disregard' survives"), in this circuit, "manifest disregard" has been reconceptualized as "a judicial gloss" on the FAA's specific grounds for vacatur, and so interpreted, "remains a valid ground for vacating arbitration awards."  T. Co Metals, 592 F.3d at 340 (citation omitted).

"[A]wards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent."  Id. at 339 (citation omitted).  Such impropriety requires "more than error or misunderstanding with respect to the law, or an arguable difference regarding the meaning or applicability of law urged upon an arbitrator."  Id. (citation omitted).  Thus, an award "should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached."  Id. (citation omitted). "With respect to contract interpretation, this standard essentially bars review of whether an arbitrator misconstrued a contract." Id. (citation omitted).

Petrocom has failed to carry its significant burden of showing that the majority exceeded its authority or acted in

11

manifest disregard of the law.  Accordingly, Petrocom's motion to vacate the Award in part must be denied.

1. Application of the Tail Provision

Petrocom argues that the arbitration panel acted in manifest disregard of the law when it held that the tail provision applied to the transactions that occurred after the closing of the April 2007 offering.  Petrocom contends that the panel disregarded the terms of the tail provision, which state that it applies only in the event of a "termination" of the agreement, when it held that the tail provision also applies in the event of the <u>expiration</u> of the placement agreement.

Petrocom relies primarily on <u>In re Marine Pollution Serv., Inc.</u>, 857 F.2d 91 (2d Cir. 1988).  That case concerned an arbitrator's award issued in response to a grievance filed by the employee truck drivers of a manufacturer and distributor of cement.  <u>Id</u>. at 92-93.  The arbitrator in <u>Marine Pollution</u> "eschewed" the contractual remedies, believing he had "<u>carte blanche</u>" to devise an award, and fashioned a remedy using "equity" as his "guiding principle."  <u>Id</u>. at 93.  Thus, the <u>Marine Pollution</u> court vacated the award, holding that an arbitration award will be overturned where the arbitrator merely makes "the right noises -- noises of contract interpretation"

12

while actually disregarding the language of the contract.  Id. at 94 (citation omitted).

Unlike the decision of the arbitrator in the Marine Pollution case, the arbitration panel's decision here was fully immersed in the language of the contract.  The panel noted that the placement agreements were "imperfectly drafted and structured" and contained "internal illogic."  Specifically, while the tail provision stated that it applied only in the event of a termination of the agreement, the survival clause contemplates that the tail provision will apply in the event of a termination or expiration of the agreement.  The panel chose to reconcile the two conflicting clauses of the agreements by holding that the tail provision also applied in the event of the agreement's expiration.  This is a rational reading of the placement agreements.

Moreover, "[i]nterpretation of [] contract terms is within the province of the arbitrator and will not be overruled simply because [the Court] disagree[s] with that interpretation." Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 25 (2d Cir. 1997).  Accordingly, Petrocom has not provided an adequate basis to vacate the panel's award of compensation based on an application of the tail provision to the post-April 2007 transactions.

2. Purchase of Au's Shares

Petrocom contends that the arbitration panel lacked the authority to arbitrate Westminster's claim regarding the purchase of Au's Petrocom shares because, as the panel acknowledged, the claim is not governed by the tail provision of the placement agreements.[2]  Petrocom further argues that because the arbitration clause of the placement agreements does not evince a clear intent to submit Westminster's claim to arbitration, this Court should review de novo the arbitration panel's decision to adjudicate that claim.

Under governing Second Circuit case law,

> To determine whether the parties intended to submit a given matter to arbitration, the general rule is that courts 'should apply ordinary state-law principles that govern the formation of contracts.' Under certain circumstances, however, the court is to apply a presumption either in favor of or against arbitration of a given issue.  First, 'the question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination unless the parties clearly and

---

[2] Petrocom also argues that the arbitration panel erred in converting Westminster's claim against Au in his personal capacity into a claim against the company.  The arbitration panel determined that it lacked jurisdiction over Au because he was not a party to the placement agreements.  It concluded, however, that the best efforts agreement between Au and AEI that provided for the repurchase of AEI's Petrocom shares by Au "purported to bind Petrocom."  Thus, it permitted Westminster to assert its unjust enrichment claim against Petrocom.  Because the Court determines that the panel had jurisdiction over the unjust enrichment claim against Petrocom, infra, it follows that the panel had the authority to allow the conversion of Westminster's claim against Au into one against Petrocom.

>      unmistakably provide otherwise.'  Questions of
>      arbitrability arise in 'limited instances' involving
>      'certain gateway matters,' which are 'typically of a
>      kind that contracting parties would likely have
>      expected a court to decide.'  On the other hand,
>      procedural questions that 'grow out of the dispute
>      and bear on its final disposition' are presumptively
>      <u>not</u> for the judge, but for an arbitrator to decide.

T. Co Metals, 592 F.3d at 344 (citation omitted).

The parties here did not "clearly and unmistakably" provide that the issue of arbitrability is one for the arbitrator. Rather, the arbitration clause in the placement agreements simply provides that "[i]n the event of a dispute," the parties agree to submit to arbitration.  As a consequence, the question of whether the arbitration agreement encompasses the claim of unjust enrichment will be decided by the Court.

The parties' arbitration agreement is worded broadly enough to encompass Westminster's claim for unjust enrichment.  As noted above, the contractual term in which the arbitration agreement is contained begins with a choice of law.  It states that the "validity, interpretation and construction" of the agreement will be governed by New York law.  It then adds that "[i]n the event of a dispute," the parties agree to arbitrate in New York.  While Petrocom contends that the term "dispute" must be read to refer to the preceeding sentence, which contains the parties' choice of law in construing the contract, that reading of the contract language is not the only reasonable one and the

15

arbitrators were entitled to read the agreement to arbitrate a "a dispute" more broadly.

The placement agreements govern the relationship between Westminster and Petrocom. Although the services provided by Westminster in facilitating the purchase of Au's Petrocom shares are not captured by the language of the tail provision, the agreement as a whole encompasses services provided by Westminster in its capacity as investment advisor to Petrocom; therefore, "a dispute" regarding the compensation due to Westminster for providing financial services to Petrocom is covered by the arbitration clause. The purchase of Au's shares was not technically a "financing" as specified by the tail provision; it does, however, constitute an infusion of capital for Petrocom, the very task that Westminster was retained to facilitate.

Petrocom further argues that the arbitration panel acted in manifest disregard of settled New York contract law when it awarded Westminster compensation on the basis of its unjust enrichment claim. Indeed, New York courts have held that quasi-contract claims brought by "business finders," such as Westminster's claims for unjust enrichment, are governed by New York's Statute of Frauds, N.Y. Gen. Oblig. Law § 5-701(a)(10). See Minichiello v. Royal Bus. Funds Corp., 18 N.Y.2d 521, 527 (1966). The arbitration panel considered and rejected this

16

argument; it stated that under New York law, "a party is not precluded from proceeding on both breach of contract and unjust enrichment (quasi-contract) theories where there is a bona fide dispute as to the existence of the contract, or <u>where the contract does not cover the dispute in issue</u>." Mere error as to the governing law does not rise to the level of manifest disregard, however; the arbitration panel provided a "colorable justification" for its decision on the unjust enrichment claim, and this is sufficient under Second Circuit precedent. Accordingly, Petrocom has not provided an adequate basis to vacate the panel's award of compensation based upon its recognition of Westminster's unjust enrichment claim.

## CONCLUSION

Westminster's October 15, 2010 petition to confirm the Award is granted and Petrocom's December 10, 2010 motion to vacate the Award is denied. The Clerk of Court shall enter judgment for Westminster and close the case.

SO ORDERED:

Dated:   New York, New York
         January 19, 2011

_____
DENISE COTE
United States District Judge